Good morning, may it please the court. George Chuck on behalf of the plaintiff and appellant in this matter. In February of 2013, Mr. Joseph Wiltz was traveling from Lafayette back toward Baton Rouge. He was rear-ended by Ms. Maya Welch. Ms. Maya Welch stipulated to liability prior to trial in this matter. Ms. Maya Welch testified that in this matter there was a light bumper in my client. At the trial of this matter, my client... Was there any damage to the cars? Yes, Your Honor. According to Plaintiff Exhibit No. 2, which is a photo of the vehicle being driven by Ms. Maya Welch, the airbag deployed on both the passenger and the driver's side, Your Honor. The vehicle, of course, had to be towed from the scene. Immediately following... Was there any outside damage to the cars that had to be removed? Yes, Your Honor. My client was driving a pickup truck with a little trailer hitch on the back. So the damage following the vehicle was to the hood because it sort of went under the truck. And there wasn't much damage to the truck because it had a trailer hitch extended past the bumper. The amount of damage to the truck was sort of like the dropping of the bumper. But the hood was dented on the car being driven by the young lady who... This, of course, was Mardi Gras weekend when they were on their way down from Natchitoches to New Orleans for Mardi Gras weekend. Had their weekend ruined. Yes, they did. Well, they started it. And as a result of this accident, Your Honor, my client had to begin to get medical attention at his primary care physician. Did he go to the emergency room? No, he did not, Your Honor. But within a week's time of the accident, he was at his primary care physician because he made an appointment. He made an appointment. That was the earliest date they gave him. At that time, my client hadn't had any complaints of back, neck, or anything, injuries in over two years. The last time my client had sought any medical attention for a back or neck was in 2011 where he was involved in a fender bender and got six weeks of treatment. Went to Lane Memorial Hospital over in Zachary, got an X-ray, well, a series of X-rays on different parts of his body. They were unremarkable except for, of course, in his lumbar and cervical region showing some degenerative changes. But there was never any MRI done. My client at the time was over 50 years old, so it could have really been expected after the 2011 accident that the MRI, I'm sorry, the X-ray may have shown some degenerative changes in his back, both his back and his neck. Well, after the 2011 accident with only six weeks of treatment and one visit to a specialist where there was never a recommendation for an MRI, the accident's in March, he's through treatment in April of 2011. 2013 is when this accident happens. My client starts treatment with his primary care physician. Primary care physician refers him to an orthopedist by the name of Dr. Farachi. Dr. Farachi treats my client and refers him for an MRI based on his complaints, which was numbness, tingling, both extremities, ridiculous symptoms, cervical and lumbar, headaches. Dr. Farachi refers for an MRI. The MRI is done in May of 2011, May 1. As a result of the MRIs, they- 2011? 2013. I'm sorry. 2011 was X-ray- You said 2000. I thought you meant- Go ahead. Yes, ma'am. I'm sorry. 2013 in May, there was a cervical and lumbar MRI done. There were objective findings in the cervical and lumbar regions. Two level herniations in his lumbar region, four level herniation bulges in his cervical region from C3, 4, all the way up to C6, 7. And his lumbar region was L4, 5 and L5, S1, with there being a tear at the L5, S1 level. As a result of those findings, that was before he had hired an attorney. What I mean is that doctor referred him to another specialist. That was an orthopedist. He referred him to a neurosurgeon, Dr. Patholomew. Dr. Patholomew examined him, saw him a couple times. He recommended injections to see if it would somehow ebb the pain symptoms that he was having. He, of course, waited on the injections, didn't want to get them done right away. Time passed. He finally got the injections in both lumbar and cervical regions. But before getting the injections, he opted to do physical therapy. He gets physical therapy. He says it's too painful. He stops going to physical therapy. They recommended surgery. He doesn't really want to get surgery, so he starts avoiding getting medical attention because the only thing left is either that or separate opinions. This goes on for a few months. In that time, he's consistently maintained his complaints of cervical, lumbar, radicular symptoms, numbness, tingling, all of the above. At the time of his initial visit with his primary care physician, he had been recommended that he take off four weeks from work. At the time, my client was a manager. He and his wife worked on a hair salon by the name of Icons in Baton Rouge. He was sort of like a manager, the gopher manager. And he had to miss four weeks of work as per his doctor, which would be also documented in the record. Moving forward, Mr. Mr. Wills at trial introduced evidence that he had suffered grave injuries at the trial level. The court, the jury awarded my client all of his medical records. I'm sorry, all of his medical bills, $21,607. What evidence did you put on? Your Honor, the evidence was What evidence did you put on that he had actually suffered pain? Your Honor, the testimony of all the three physicians, Dr. Bartholomew testified at trial, objective findings at numerous visits. Even in the radiology report at the time of the MRI, it indicates that there is a curvature of the spine and there is also spasms at the time of the MRI. Was that tied in the doctor, an expert testimony tied that to the accident? Yes, sir. And of course, each physician, the surgeon testified unequivocally that he linked all of the symptoms that were presented at the time of his visit. The history, the physical examination, as well as the presentation, the complaints and the treatment he gave as per such were linked to the accident of February 8th of 2013. That's Dr. Bartholomew. Did the two orthopedists and the neurosurgeon know about the prior injury in 2011? Both of them knew about 2011. But let me backtrack here. There was a 2005 accident that my client did not inform at least one of the three physicians of. And it was revealed at trial that not only were those accidents in his history, that back in 1991 up to about 2004, he had been involved in some workers' comp injuries and may have not been forthcoming to the jury as to those previous injuries. But there was no treatment after any of the releases. This wasn't a chronic condition. It was multiple injuries, not a preexisting injury to a region. He just had previous incidents where he would be released, no continued treatment, no doctor intervention at all for years until the next incident. But it was lumbar and cervical. Yes, ma'am. It was lumbar and cervical in nature. There was, back in 1991, an MRI that was performed on my client that is lumbar region that may have revealed that there had been bulges in his back in 1991. This is because of an accident when he was a police officer down in Broke Ridge and was involved in a pretty serious accident in 91. The accident before the court and trial was an accident in 2013. And after none of those accidents was there any continued treatment. There would be a period of treatment, basically like soft tissue, even though there was a finding, an MRI, objective finding, that wasn't the continued pathology. My client, like I said, up until the injury of February of 2013, he was in relatively good condition as it relates to being asymptomatic. I don't want to know penny by penny, but what was the bulk of the $21,000 in medical expenses for him? He had two series of injections. And he had the rhizotomy performed. So the bulk of it was at Omega Hospital, or Dr. Bartholomew. But this is a sort of non-invasive surgical intervention. Omega Hospital in New Orleans? Yes, ma'am. And that was injections or what? What was that? And a rhizotomy. He had a rhizotomy performed on his lumbar region. And how much was that? I mean, just ballpark. The Omega bill was $11,000-some-odd, ma'am. And the remainder bill was a massage therapist. When was that, the Omega bill? 2014. Just ballpark. Yeah, and the record will show that my client consistently treated from, well, the period, the duration of his treatment from the time of accident up until the time of trial. Even six days before trial, he was at Dr. Bartholomew, and Dr. Bartholomew at that time was recommending another round of injections. And that was just in preparation to time over to see if he was going to be able to get surgical intervention because he had already recommended surgery for him. Was any pain medication prescribed? Yes, ma'am. He was prescribed pain medication. He was actually also prescribed Viagra during this representation. We don't want to know that. Okay. Well, that's a limiting factor. The plaintiff's position is that there has been no evidence, and the record is devoid of anything to indicate that there was a reason for there to be a full award by a jury of all the medical costs and there being no award for any of the generals, no pain and suffering, no future pain and suffering, no future meds, and no lost wages. Did you present testimony or proof of lost wages? I did, Your Honor. My client testified as well as ending to the record a document prepared by the company they worked for, of course it was he and his wife, of loss of $5,200, which he testified to was $1,300. For the four weeks he was in? For the four weeks. Did they put on evidence, though, that that was controverted, I thought? It was controverted by entering to the record a document that my client's wife said she couldn't find any actual records, as in payment, but his records as in him being an employee. There was no records, but so she prepared a document that indicated what he was getting paid because they were owners. Because there were no tax returns, right? I'm not sure, Your Honor. There may have been tax returns. There may have been tax returns, and there was a counterargument to the lost wages issue, but, of course, there's the doctor. We have the actual excuse from work for four weeks at the time of the absence from work, back in the first four weeks after he went to his doctor, which was about two weeks post-accident. One of the germane issues, again, is the defense expert witness, Dr. Partington, in his capacity as an expert witness, divorced any of my client's complaints from the accident, but, of course, as a radiologist, he affirmed that my client's injuries satisfied the temporal element as related to the findings of MRI. There was a level of herniation that he testified unequivocally that this herniation correlates with this trauma. There was no other explanation that he would give for that trauma, I mean, for that herniation that is C3-4, but this accident. Without saying the accident, it correlates. It could very well be this because there were no subsequent injuries. There were no subsequent traumas to this accident. There won't be any testimony as to there being a trauma to my client prior to post-2011 or prior to 2013 or post-2013 accident. Okay, Mr. Tucker, you've saved us five minutes for our rebuttal. Mr. Thomas, we'll hear from you. Richard Thomas, on behalf of the Senate, and the State's Ms. Welch, and State Farm, Your Honor. We disagree in regards to the facts presented at trial that the court just heard. Mr. Welch was totally discredited, not only in regards to at every stage, in regards to the trial concerning his history. It's totally untrue. It was discredited at the trial because it was only at the trial, when we took Dr. Huggins' deposition, that they even knew, presented the 2011 accident. And then to get back to 2011. I thought he said it was 2005 that he didn't know. See, I didn't disclose the public records of his past litigation until after that for the specific purpose concerning his history. He gave a history that was untrue in regards to written discovery. He gave a history to his doctors that they had no knowledge of that was totally untrue. And at trial, he even was impeached because they didn't know or had the other issues concerning his past lawsuits, injuries, etc. Why would the jury, if that was true, why would the jury have awarded him all of his past medical costs that went from the day, just from the day of the accident to trial? I mean, if those weren't related to injuries caused by the accident, why would he get past medical damage? We have to assume something. And the assumption is they didn't believe the doctors were part of his shenanigans. Then why would they award him? Because they wanted the doctors paid. And I have to assume that from the record. You assume that, but that's the reason for the Louisiana law that essentially says if you return damages, there's got to be some award for general damages. We're here because of motion to do trial. How do we get around the law of Louisiana? That's what I want to know. The court under Brainwright, and if you look at all the cases under that case, even the cases where somebody gets checked out at the doctor's with no pain and suffering. If you go to what the court is saying, and they specifically say, Louisiana Supreme Court specifically says this in Brainwright, there has to be objective findings of an injury related to the accident. We don't have that here. Well, you have some of it. You have some evidence that we just heard. It said there was some evidence that said that this could be correlated to nothing other than this trauma could be correlated to nothing other than the accident. That's not what Dr. Partington said, Your Honor. If you look at what Dr. Partington said, he said you'd have to have. It could be correlated. It could be correlated because of the generative nature of the spine. He didn't. He didn't say, well, probably not. The burden of proof that the plaintiff has. He didn't say anything like that. He said you would have to have an accurate history. None of the treating physicians had an accurate history. Dr. Partington doesn't have it. So what, when he said. I mean the jury just made a, from your point of view, I mean it seems the jury made a mistake. They should have awarded him nothing, and you would have been home free. But having awarded. That's correct. But having awarded the past medical, especially in response to the answer that the legal cause of his injuries was the accident. No, the jury never made that determination. I thought they did. No, sir. In regards to the jury, I wanted them to make that determination, but in regards to the jury question, there was one question. And the question was, what are the basic paraphrasing, what are the damages? Well, that's because your client stipulated to liability. Yes, but the plaintiff has to prove causation and damages. Well, it says fairly compensated plaintiff for his injuries. That's correct. And they found that his injuries, past medical, past medical expenses for his injuries were in excess of $21,000. And in every one of the cases, including the Rainwright case, in Louisiana, the court looks for an objective injury. You'll see cases like a bruise to the chest we don't have here, a broken nose we don't have here. Would the injuries be the damage resulting from incurring these medical expenses? Would that be an injury? Well, I say this is different than those line of cases. The question is, was the negligence of the defendant a legal cause of any injuries to the plaintiff? And they said yes. Well, injuries could be past medical expenses without pain and suffering. That's correct. And that's why the case is distinguished between those issues. And the only time that on this motion from Rainwright and all the progeny of those cases that they overturn it is when there's an objective finding, not a subjective complaint from, in this case, the plaintiff. That's not what they're making a distinction. And Louisiana Supreme Court made a distinction in Rainwright just of that. Is there an objective finding, a broken nose, a bruised chest? We don't have any of that here. How they link it is, and the only thing they proved, is that Mr. Welch said he had a complaint. And I specifically asked Dr. Bartholomew on page 520 of the court's deposition, in your vernacular, in his wording, are your symptoms? What are they? He says they're his complaints. And by definition, that is subjective. And in this type of case, that's what the Louisiana Supreme Court is saying. When they overturn it— What did the plaintiff say about the physical injuries that he had sustained? He said he had pain. And that's the only thing that they relied on. And that's why I asked Dr. Bartholomew that question. But shouldn't the jury have been—the jury could have compensated him on that basis for pain if he said he was suffering? That's correct, but they chose not to do that. So now we're presented with the motion of new trial, 59E, and what it—under Louisiana law, on a diversity case, what did they determine? And they're very specific about that. Objective evidence of injury. And all the cases say the same thing. And the reason they do is for this situation. And in every case, they're presented with this situation when you have it. That's why there's no red line. But Bray Wyatt says more than there's no red line in regards to these issues. You've got to look at what the facts were—the facts that were presented in regards to the objective injury. He said that it wasn't per se invalid. They said a verdict would not be per se invalid if they awarded medicals but no pain or suffering. That's correct. And they looked at, in Bray Wyatt's specific, objective injuries, not subjective complaints, objective injuries. And there were none here. How fast was the car behind him? He was stopped in traffic. We stipulated liability because it was just that. No, I know. How fast? Is it accurate? He was stopped. She rear-ended him. She did. How fast was she going? Well, to answer that question, I don't want to be specific on that because I don't think she knew. But put it this way, the plaintiff in this case, Mr. Welch, was, I guess, renting a vehicle from another individual, had no knowledge of damages to the vehicle. So there was really nothing. He had a ball joint, and it didn't even, I don't think it had much damage at all. It had more damage to my vehicle because the ball went through the bumper. So the truck had no damage? I hate to say no damage. My insurance didn't see any damage. But that wasn't an issue in regards to the jury. Well, it's an issue on how hard the impact was that caused injuries. Right. But I think to answer the court's question, the reason the jury did it, truth matters. And this gentleman chose not to tell the truth and absconded with the truth in multiple times. Did doctors testify they had not been paid? That's an interesting point. And, by the way, in that regard, when I said that it took months to take Dr. Prothoma's deposition, that the plaintiff attorney in the records referred him to. And he hadn't seen him for months and months and months. And so I show up, hadn't seen him for months. He did an ESI the next day after the deposition. Yeah, you can do that, but come on. All of these in the wide world, the only thing, and that's why the only thing you get in these types of cases that have the result from a jury are usually this. And when it's overturned, there's an objective. There's a fine. There's a broken nose in one of the cases. In one case, and I didn't cite this because it had the same logic as Louisiana Supreme Court and Rainwright, nobody even argued, and I think it was Bienvenu, severe spasms at the time because it was a comparative fault. Nobody even argued that type, but that's not what we have here. What about lost wages? Oh, when we got this, he complained of lost wages. I sent a subpoena to his wife's company, Icons. They wrote back, and it's in the evidence. There's no evidence of lost wages. At the start of the trial, the plaintiff's wife, who does the books, was going to testify. Well, after the cross-examination, I never saw her again. The plaintiff, sometimes you learn more from what's not presented than what is presented. So the only evidence they have of any lost wages is, once again, Mr. Welch's testimony. Did you controvert that somehow? I cross-examined him in regards to his wife's written letter saying they have no records of lost wages. So all this goes back to Mr. Welch. And that's why I think the Louisiana Supreme Court, and Warren Wright was a prescription case on a child, and that's how they set this up. But there's other cases, and they all look. When they overturn in regards to the issue, is it abuse of discretion? The courts look to see what are the objective findings related to the injury. Not subjective complaints. That's what they're trying to get away from, because there's a reason the jury did what they did. I argued that he should get nothing because he was untruthful. I did argue that. I thought that was the case. I think the jury thought that was the case, but I think they wanted the doctors to be paid. Did you cross-appeal the award? No, I did not. Okay. Was this case mediated post trial? Yes, it was, Your Honor. Before Judge Reitling. Thank you very much, Mr. Thomas. Mr. Tucker, we'll hear from you next. Would you like to engage in a rebuttal? Yes, Your Honor. Okay. I would submit to you that counsel's argument about subjective complaints has no merit. We have specialists. We have each doctor. We have his primary physician, primary care physician. They are testifying clearly to objective findings, spasms. We're not talking about somebody who just comes to court and says, I was hurt. We're talking about when the doctors went through their battery, the complaints, the history. Here's what he's talking about, though, it seems to me. Your client goes to the doctor, and he says, What's wrong with you? And he makes a complaint. And the doctor finds nothing that substantiates the complaint, but he accepts the fact that the man says he's hurted. That is not this case, Your Honor, at all. What was the objective entry here? Once again, Your Honor, the doctor's medical records are full of objective findings. What was the objective entry? How do you describe it? The objective findings were spasms, and they linked the spasms. There was a correlation between his complaints and their physical examination. The injury, you said the injury was that the — He had radicular symptoms in his cervical and lumbar spine. We can never give an exact date of herniations, but the doctors traced that his complaints correlated with their test. These are objective tests. His complaints are subjective. That's what prompted that test. What do you mean when you say correlated with? His argument says that that doesn't do you any good because you've got a burden of proving some kind of injury, and you can't just say that it correlates. No, I'm not saying it correlated, Your Honor. I mean the doctors. The doctors. The records have all of that in them. That's not even an issue as to whether there's somebody who clearly indicates it. You can just look at the radiographic report. It indicates spasms at the time of the — What if the jury decided that I've had spasms and I'm not going to compensate that? But the jury has decided to have spasms, not compensate. That means they're ignoring the record, Your Honor. Well, how much are spasms worth? How much were you asking for? It wasn't spasms, Your Honor. The spasms correlated with his complaint, and the doctor indicated that there were herniations that answered the ridiculous symptoms. See, it's not— How much were you asking for in each of the categories? I don't have it before me, Your Honor, but I think the total was 200 and some thousand. I mean, it's the— Each doctor testified to their— Nobody argued with the radiographic field indicating my client had herniations. This case is not about me trying to prove when the herniation happened, but the court being positioned to be informed by the experts that these herniations are the cause of his complaints. Well, but where was the evidence that this 2013 accident was the cause of the herniations and not degenerative or prior accidents? It's not about me proving herniations, Your Honor. My client is at the doctor because of symptoms, not conditions. Now, but what were his symptoms other—he said he had pain. Where? Your Honor, the record indicates ridiculous symptoms—numbness, tingling, burning. The whole—all the things that go with ridiculous symptoms, both lumbar and cervical lesions. And that was—those were his subjective symptoms that he testified to. He testified to that, and the doctor did objective tests to corroborate his complaints and the history that was given. Because, Your Honor, what we have here is there is no testimony at all, and there won't be—there's been no testimony, no evidence, nothing presented to the court that would answer these symptoms. Nothing. There is only one trauma. See, all of these traumas that he sent about and my client was not forthcoming about, Your Honor, from 1991 to 2005, the record has in there that my client— You know what he sent about that he didn't know about the 2011 accident? When he got my client's certified records, it came with the 2011 records because it's the same primary care physician. He was fully aware of the 2011 accident. He testified to the 2011 accident. What about the 2005? 2005 accident. Well, that accident indicated—at the emergency room, there was no more treatment. I mean, we have a 2011 accident with six months—six weeks of treatment. We have a 2005 accident with abbreviated treatment. I'm talking less than a week. The ones before that are workers' cartilage injuries from 1990 up through 2004. After the 2011 accident, there is a whole two years with there being nothing. No back complaints. No visits. All of that's in the record. And when counsel is testifying that Wayne Wright's Tampa Center, what it does stand for is that if there is proof of objective findings and there is—if there is proof of objective injury, then my client is entirely recovered. And that's not for me to argue. That's what the record will reflect. Okay, Mr. Tucker. I believe you have a red light. I think we have your argument. Thank you very much. That concludes this—